Good afternoon. It's Dylan Khosla for Petitioner Sutter Nguyen. In these courts, he does prefer to be called Sutter, so that is why I refer to him as such in his brief. And I want some of you to hear Judge Hawkins. If I'm looking this way, am I looking at you? In case you have a question later. You're looking at me, guy. Okay, so I'm going to move the cameras around. You have to have your 28-page brief. I understand that. Excuse me? Was it approved? Yes, it was. And believe me, it put me in terror to put it before this court. It's very, very hard to read. It didn't serve you well, to be frank. You know, I don't know. I think that the record that the state submitted here, and as you saw in their answer, they say essentially his fate is doomed, begs the question. I understand that there is a comedy to the state forum, but there are federal rules that are promulgated to help the district court go through a record and do a meaningful review. Here, basically having spent almost a year reviewing this record, these 9,400 pages were out of order. But that is just one question. Extracting the evidence related to this client was a monumental task. But there were patterns and irregularities that kept coming up in this record that were difficult to ascertain and brought me back and back and back to this record again. I have continued to document what I have seen, and I will just put this before the court. I have done so in a way to try to be as efficient as possible, but those irregularities have escalating concerns in this case and would relate to any prejudice if there was something that you thought might make out an error in this case. So as far as the uncertified versus certified issues, I want to just ask for your interest in what you would like to focus on, or for me to focus on. Okay. Okay. Procedural problems as in? Okay. The procedural default wasn't raised before the pullout, so if there is one, that's something that's corresponding. D7's issue, obviously, I put the D1 concession up there, because I think that is an issue that appears to be foreclosed under normal circumstances. So that would be an issue that would be reviewable under D2, and that relates back to what I was talking about in terms of reviewing this record. You'll notice that I discussed the unique synergy between the prosecutor and defense attorney for Bruce, Tom Masuda, in terms of how this case was tried. That was one of the crippling things about reviewing this record, because you cannot put forth a theory or facts before a court unless you have proof to back it up. These eight months of proceedings, which, like I said, were out of order when you put them together, I can prove that they acted together in concert to make Sutter appear more relevant. If that is something that you think is appropriate for review, I am prepared to present that to this court. That is one of the reasons I started down that road. I think also in terms of the factual findings, we put the two issues before there. The state court essentially just said, well, here are the same charges. That does not answer the question in terms of Taylor v. Maddox. If you can touch upon the D2, it's wrong. And then the second question, which relates to this. Yeah. Are we talking about the severance question? Yes. You said start with the certified issue. I'm trying to understand. So what you're saying essentially is you understand that you can't do a D1 claim for severance because it's so clearly established in the Supreme Court law. Yes. I'm saying that it looks like the way that the cases are characterized by this court in Collins, that would be the case. Unless they were saying even if Zapata leaves that open when Justice O'Connor said if there's a specific trial violation that's violated by the jointer, then there might be that overarching due process principle at issue, which brings up all of the sort of fighting throughout the federal courts in this land about how broad is a principle that you can use under the ATPA. But assuming that there's not that gateway, then it would be a D2 question or whether it can be aggregated for purposes of cumulative error review in this case. So there's an embedded question, which is can you use a D2 violation with respect to a constitutional theory that isn't D1? Yes. I know you can for the cumulative error review. As far as D1, I would believe so because I'm just trying to think of an example because I know I looked this up. Because if it's de novo, right, then you can look at the sports law, and then you would have all of the Sandoval and the Peters. That's the question. That's the question. That's where. It could be it wasn't briefed as such exactly. Yeah, I know. I tried to look, and there's only two or three cases. There's Maxwell Wright v. Roe that talks about the antecedent. If the antecedent factual finding is incorrect, then we go to de novo review. And then there was another one that was amended and altered, and so I couldn't quote it because it took some language out. But what's interesting, I think, and this relates to Panetti, which is the one Supreme Court case that made that statement. Justice Kennedy does something interesting in that case, and it relates to why there is so much, for better or worse, fighting about the ADPA right now, is there has been sort of a convergence since Williams with Teague and the ADPA criteria. So Justice O'Connor had three criteria and reasons she distinguished it from Teague, and those three have been whittled and converged, and that's created this confusion. So if you look at Panetti. Sorry. So Panetti, in terms of the question of the de novo review, it was a dean one case, which is why it's a little bit odd. And then Ms. Gordon-Maxwell applied the de novo to a dean two and started citing Ninth Circuit cases. So I think it's an up-in-the-air question, but it would seem that if it's an unreasonable factual determination, if you don't go to being able to use Ninth Circuit or Circuit precedent, then you would really be going back to dean one, in a sense, but de novo. So I'm not sure that that would work. What was the harm to your client from failure to serve? An escalating harm that I've continued to put piece together, which is that he was sort of the hook for the gang, because if you look at the evidence, they did not know which gang was involved. So when Sutter's counsel asked the cop, he said, oh, you're whispering, you have to speak louder. She said, what did you see when you arrived at the crime scene? And he said, 30, a crowd of hostile, angry men wearing red. So there were only crips on trial in this case. And so when the two other men were caught right at the scene, as you know, the main guy who had the gun and the fingerprints on the gun had no gang connection that could be proved to this particular gang. This particular gang's name was not mentioned at the scene, unlike the prosecutor represented. There was no evidence whatsoever. Was there a cooperating witness that identified your client as a member of the gang? You mean John Dyke, who was the immunized witness? Yes. Yes. He said he heard that he was caught. That's my question. Yes, there was a witness, cooperating or not, that identified your client as a member of the gang, correct? That's correct. And he also said he got that information from Probation Officer Winfrey, who first denied ever talking to John Dyke, and then said he did. And it came out against him. What I'm looking for is a list of facts that could not have been, that were proven in a joint trial that could not have been proven in a separate trial. Could you list those for me? I could, and I think it would take, unfortunately, more briefing, because there was a coordinated strategy. I hear five best. My five best would be that at an individual trial, first of all, the jury would have been given that instruction as a sui sponte duty that Bruce and Williamson are considered accomplices as a matter of law. And so, therefore, they could not have taken that advice from the prosecutor during closing that went to everybody puts Sutter at the scene, because they could have only been left with motive, nothing to corroborate John Dyke in that sense. Right? So that's a big piece right there, because that would have ended the split verdict potential of confusion. And in terms of how the trial was coordinated, and this was an eight-month procedure of how this was done, wrapping around every time Sutter's attorney, for example, she had information about, she brought forth John Dyke's pending conviction and murder conviction. And then it came out that they couldn't tie the gun to him. So what the other attorneys did was continually hammer John Dyke about his pending murder conviction and focus on that gun. And then it came out that the gun that was supposedly tied to Sutter through another guy, there was a cold hit on it, and it came up months before. It could have ever been Sutter's because he was in custody at that time. So that came up. But what they do is throughout this trial, the other two attorneys with the prosecutor go into diverting into John Dyke and other issues like a different charge to subterfuge what Sutter's attorney kept trying to do. If she was alone in a case, there would have been no self-defense issue. There would have been no imperfect self-defense. There would have been no, these gangs are bad, this gang is bad, and they were all shooting. It would have simply been her saying, look, yes, Sutter had some contacts when he was 14. Yes, that is pretty much all that you can show here. But there's nobody here to identify him. But when you spend four months saying, and boy, and Sutter. Boy. Boy. Well, boy was and wasn't. That's the other problem. He was dead, right? I don't know. But I thought that they identified him as being there. They identified him as shooting. But boy was. The court said it's dead. John Dyke just called and said he was there. Right, but the court of defendants never brought it up until the trial. So what? But they did say he was there. They did. And then they retracted. Right, except that instruction that they would be accomplices in a matter of hours. What happened here? That's the challenge. That department is determined to be accomplices in a matter of hours. Right, but the instruction isn't given when you're tried with somebody in California because it creates a diffusion of accomplice liability. It's probably an extremely stupid question. But how was your client convicted of some murder but not shot? What's the logic? If I have one, what do you think? Or is it just a conspiracy? I think the prosecutor directly argued, as it should, in their reply for a compromise verdict. He said, go ahead and find John Dyke had a gun. Go ahead and find that he's an accomplice. It doesn't matter. Sutter had motive. We know he's friends with Boy, who died and was not really tried here. And we know that everyone says he was there, everyone meaning the two accomplices, as a matter of law, who could not be used under California law in a separate trial, because they would have to give that suspect an answer. I actually know she had this was felony murder, and he would have been guilty if he had been shot. Well, that was the other thing. When Sutter had a prelim hearing, they had separate prelims, the judge there had the prosecutor dismiss one of the great bodily injury firearm allegations because she said, if you can tie the bullets or you can exclude him from the bullet that went into the victim, then under California law, you cannot use the group beating instruction or the group shooting, where we can't tell who did it in the kill zone. There's aiding and abetting. They did that as well as the theory. But they did a group kill zone instruction, and the prosecutor asked for that sort of at the last minute and amended the charges to do lesser firearms enhancements to the other two defendants because they were fighting about who had the gun, because John Dyke quit it. Given the possibility of this group killing, given the possibility of any defendant getting shot, is there a logical reason it's possible? It's compromised possible. It's not logically possible because he didn't have a gun. So his only act, according to any witness, right, is pulling out a weapon. So it's not saying anything. There was nothing that he said. There's no movement he made, no action that would basically incur his death. Let's go for a minute. You do have an issue about the gang evidence. Yes. Why didn't the State Supreme Court issue a suit against him? Well, the State Supreme Court just denied release. How did the State Supreme Court do that? So the Court of Appeal came up with a factual reason that no one argued below, as I said in Debris, and that is contrary to the record directly. So what it tried to do was try to fit within the box of California law that says you can only let in evidence from motive if there's no enhancement charge, if there's a rival or suspected rivalry. So that's what the prosecutor did and turned around and said, no, there was no rivalry at all when the witnesses were put on. And then the California Court of Appeal inserted a different reason, which was that the gang that was actually at the party is, quote, and that is directly contrary to the records. They don't fit within the scheme of their own California law, unless they get this put in there on their own. But the evidence was partly just that these were rival gangs, but was there some more specific evidence of them? I just think about it. They say, you know, where are you from? That means, well, going to fight. But there was more than that, too, in terms of identifying individual people. Was he identified as a gang member by this validation thing, or by what? Well, Sonny was identified as a JVP member way back when he was 14. So five years before. Right, but the prosecutor only got it in, and as it showed in the reply brief, even four months later before Winstring testified, the expert, the judge, again, reviewed his gang rulings and said only let this in because you said that there were witnesses who heard JVP at the scene, this gang that Sutter was tied to, and the other two really weren't, and that they are rivals. Both turned out to be untrue. And the Elaine Stips detective testified the only gang she heard in her investigation was another different gang named Insane Viet Boys that was involved. Police said they were a hostile crowd of 30 people in red, and the prosecutor shut down any questions about members who were wearing red, saying we know these were Crips gangs, this was JVP, and this was LGC. And then when he was asked, you know, through seven different times to bring forth lists, he had no proof that the people like Tosin and Viet, who were on the other side, quote, victims, were members of that gang, So we don't know what gang was involved here, and that's the link that Sutter provided, because he could get in gang evidence, but if you look at the evidence, right, he starts out saying you're not going to use boy. He whittles it down with his proffer. He brings back a dead person who was never identified by anybody until they did one girl who never told police for two years until trial, and says, yeah, I saw a boy in a car, and was basically impeached so much that she was then threatened with a perjury charge, and basically there was this bantering back and forth with her as the one witness. So this is what happened in this trial. We don't know what gang it was. The only person that testified against Sutter was somebody who was so heavily impeached that the judge said he lost credibility and lied so many times, was identified himself as the shooter, and Sutter was never identified by anybody else. So if there's any error, yes, please, go ahead. Okay. I was just saying if there's any error at all, that this paper-thin evidence that Judge D'Souza called in Taylor here is not only paper-thin, it's almost as unreliable as factual. It just doesn't have that same habitual perjurer element that that case has here. Okay. Thank you very much. Okay. Okay. Thank you. Okay. Thank you.  Thank you. Thank you. Would you like to ask a question? Please. Okay. Please, the court, Justice Reilly, on behalf of the court. On the severance issue, we can't get close to a de novo review here because it is a D-1, and even the characterization that it should be a D-2 claim is simply a disagreement with the state court's prejudice finding, and a prejudice finding is not a factual determination. It uses facts, to be sure, but the petitioner does not point to a single fact that the state court appealed, arguably not wrong or so unreasonably wrong that it should transform this case into de novo review in disagreement with the state court's prejudice analysis, and by going through the entire record, what the petitioner is doing is making a legal, is arguing against another legal determination. Let's go over the facts just a little bit. Sure. Because the last statement by Mr. Kozloff was that this is a paper-thin case, and it looks like we had the two gang members, I think it's Lamson and Bruce. Is that right? I think so. And did they or did they not implicate Mr. Quinn? They, I think initially they said he was there, or actually fired, and then later didn't state that. And I guess I just want to find out your view. What's the most, what was the compelling case that you think that the jury relied on and found Mr. Quinn guilty? I don't know what the jury was thinking. I shouldn't even look at the evidence. What are the facts that you think supports the conviction? I think this was a big gang mess. I think there were converging and diverging stories from pretrial onward. I think every single witness, every single pretrial statement was either contradicted or changed. What are the facts against Mr. Quinn? He was placed at the scene, both pretrial and at trial. By two co-defendants? Two of the co-defendants placed him at the scene, and John Dee placed him at the scene and actually placed a gun in his hand. Both co-defendants at trial changed their stories to we saw him there, but he didn't have a gun. And that's, by the way, why the jury may have determined, oh, he wasn't armed. Everybody at trial testified he didn't have a gun. There was a cooperator, though, too, right? That was John Dee, yes. And that was Mr. Dee. Yes, and John Dee made a pretrial statement that the petitioner here was actually shooting and actually shot one of the victims, but then later at trial changed the story and said, no, no, no, I didn't see him with a gun. Were any of the defenses armed? Were there mutually antagonistic defenses present? No. There were identical charges. The co-defendants put on a self-defense for defense of others, a stop defense. And then to the extent they referenced the petitioner at all, it was, oh, yeah, he was also there without a gun.  This is the kind of case that the prosecution almost has to try together, because if you separate out these defendants, they clam up, and they start pointing fingers at each other, and truth is actually obfuscated. But the combination probably helps the legislature here. Was there a difference in the accomplice instruction or lack thereof in the treason? No, accomplice instructions were given in this case. But with regard to the co-defendants and John D., it's a factual determination, and so the trial court gave the accomplice instructions, which do not tell the jury to disregard the justice. Just tell that they didn't because you don't trust their co-defendants. That's just wrong. I'm sorry. It was given with regard to John D. I see you're wrong. All right. It wasn't just that he had been tried separately. It could have been given with regard to the co-defendants. That's true. And it only tells the jury to ask questions. No, when I ask a question, you can't answer it. I'm sorry. Yes. And I'm sorry. And the jury instruction would simply tell the jurors to look for corroborating evidence, which in denying the claim that the instruction should have been given with regard to the co-defendants, the trial court did find that there was corroborating evidence. Yes, yes. I'm sorry. Oh, okay. That's an issue. And under this circuit ruling, test 22, I'd like the opportunity to brief that if the court's inclined. I do know that Winfrey was a gang expert and testified with regard to who were gang members, gang member practice. So if Your Honor has a specific question. Well, you just said this was a gang mess. And so I'm describing this. And so there is this whole challenge to the gangs. And obviously, Mr. Winfrey, I just thought I'd give you an opportunity to talk about it. Oh, I'm sorry. Not specifically on the admission of evidence, but the – I'm sorry, I can't see. There was a question. I mean, I must say that all this gang evidence also sometimes gives me great thoughts. But it wasn't validating gang members. That means that by some police accounting system, the police thought he was a gang member. Yes. What kind of testimony is that? We think you're a gang member. That's evidence you're a gang member. We think you're a gang member. That was a check question. There were still things in the check question. Well, he was not charged with being a gang member. Yes, I understand. But it was a testimony that he was a validated gang member. Yes, for purposes of showing motive. I understand that. But what does it mean that he's a validated gang member? Does the police have a list of being a gang member? And so when a rival gang is – has their party – Well, I understand, but ordinarily, I mean, except in the gang world, you don't tend to have policemen getting up and testifying to say, you know, we believe this guy is X or Z because we have a list of criteria by, you know, we think this guy's a drug dealer because we have a list of criteria by which we decide he's a drug dealer. If he was being charged with being a gang member, that may be a different analysis. But there was testimony that he was – the testimony was he's a – if somebody says a validated gang member, certainly the jury's going to think that this is authoritative, but in fact it's a judgment by the police. Yes. Was there an objection to that? Objection to the – I do not remember the specific objection. I'd love to answer any other questions. I'll continue briefing. I have the uncertified questions. We'll let you know. Thank you. Thank you. I just want to focus on a couple of things. We're talking about whether Sutter or not was a validated gang member. The issue is even if he was, was this the gang that did the shooting here? Is he guilty? That's the question. Is he guilty of being a low-level gang member, which Kang and Winfrey even said himself, you know, somebody who was when he was 14 at some low times. But the other thing I would like to ask is, you know, with the ADPA as narrow as it is, there's only one guarantee for a defendant that's promised, which is a meaningful review. And here what you have is a state that's submitted none of the briefs that are required by a rule that's been in place for two decades. There are 9,400 pages out of order that it would take a savant to get through, and even then, maybe not do a great job. But it is incredibly difficult. And for a district court that's incredibly busy in this case, to say that the comedy given to a state is so strong that there's no collegial respect of having to follow the federal rules to give a meaningful review seems to me odd that he gets to then bypass you as the COA unit. Is there a separate claim of some kind? No, I'm just trying to say that, you know, in terms of him raising the 922 rule issue that bypassed, you know, certain certification procedures, I think this all ties into this case and the challenge with this record is what I'm trying to get at. Okay. Thank you very much. Thank you. And thank both of you very much. This has been a great deal of care, and I look forward to hearing from you in the cases that you have to review.
judges: Hawkins, Berzon, Murguia